RECEIVED
IN ALEXANDRIA, LA
OCT 12 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| STACEY CARTER | CIVIL ACTION NO. 05-0765-A |
| -vs- | JUDGE DRELL |
| TIM WILKINSON, et al. | MAGISTRATE JUDGE KIRK |

### RULING

This case was tried on the merits on March 29, 2007, and the parties filed post-trial briefs immediately thereafter. The core issue involves the application of the Americans with Disabilities Act ("ADA") in the prison context. The plaintiff, Stacey Carter, an inmate at Winn Correctional Center ("WCC") in Winnfield, Louisana, sustained minor injuries when his wheelchair caught on a raised metal lip in a doorway and threw him onto the floor. Because the ADA establishes the maximum height and slope for any potential obstacle in a doorway, this is the rare case in which the most determinative issue is quite literally a threshold issue. Ultimately, because the height of the threshold at issue was later independently found to be out of compliance with the ADA, we award the plaintiff compensatory damages for his minimal injury.

## I. Background

After suffering gunshot injuries in 2001, Carter underwent hip replacement surgery and has been confined to a wheelchair ever since. He has been an inmate at WCC since 2003 and is housed in Birch Unit, which also accommodates other inmates with physical disabilities. On April 29, 2004, he approached the dining hall at WCC, and as he attempted to enter the hall his wheelchair got stuck on a raised threshold, throwing him forward onto the floor.

Carter immediately complained of pain and was taken to LSU Medical Center in Shreveport, Louisiana for tests. He was discharged the same day after being diagnosed with muscle strain in his back, contusions on his hip, and a minor scrape to the lower right leg. Prior to the accident, he regularly took 600 mg of Motrin for pain. For a short time following the accident, his dosage of Motrin was increased to 800 mg, and he took several administrations of Flexeril, a muscle relaxant. However, he was back to feeling normal no later than two months after the accident, was back to his normal dosage of Motrin, and had finished his Flexeril prescription.

Carter filed two substantially similar administrative complaints, one completed on May 3 and received by the prison on May 5, 2004, and one completed on May 11 and received on May 12, 2004. (Exh. D-1). In both of them, his primary accusation was that the threshold was not ADA compliant. In response, the prison administration had Edward Johnson, a maintenance

employee, measure the height of the threshold. (Exhs. D-2 and D-4). Johnson determined that it measured three-eighths of an inch (3/8") high and did not drop more than one inch (1") per foot, thus complying with ADA standards. (Exh. D-2). The prison's official response to Carter's May 5, 2004 complaint echoed Johnson's finding and flatly stated that Carter's assertions that the facility was not handicap accessible were not true. (Exh. D-1).

On May 2, 2005, Carter filed this action, still asserting that WCC was not handicap accessible. Both Carter and the defendants, Warden Tim Wilkinson and Corrections Corporation of America ("CCA"), proceeded under the apparent assumption that Carter was asserting claims of "cruel and unusual punishment" under the Eighth Amendment. Accordingly, the Eighth Amendment theory was the focus of the magistrate judge's report and recommendation relating to the denial of both plaintiff's and defendants' motions for summary judgment (Doc. # 40), which in turn was adopted by this Court in the judgment of August 1, 2006 (Doc. # 42). However, it seemed clear to the Court at trial that alternative theories of recovery might also be possible on these facts, so we requested that the parties file post-trial briefs on (1) whether the violation of an ADA standard would bring the case within the purview of the Eighth Amendment; (2) whether there is a compensable claim under the ADA regardless of any Eighth Amendment violation; and (3) whether there is a viable state law tort claim. Having received the parties' briefs, we address each of these issues in turn.

## II. Eighth Amendment Claim

The report and recommendation on the parties' motions for summary judgment (Doc. # 40) sets out the law relating to Eighth Amendment claims as follows:

> In order to succeed on an Eighth Amendment claim, the plaintiff must establish that the deprivation alleged was sufficiently serious and that the prison official acted with deliberate indifference to inmate health or safety. See Farmer v. Brennan, 511 U.S. 825, 843 (1994). Conditions of confinement that rise to the level of an Eighth Amendment violation are those that are "cruel and unusual" under contemporary standards. See Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998). To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. Id. However, when the restrictions of confinement rise to a level that they result in pain with no penological purpose, they constitute cruel and unusual punishment under the Eighth Amendment. Id. It is the "obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id., citing Whitley v. Albers, 475 U.S. 312, 319 (1986).

(Doc. # 40, pp. 4-5).

In the instant case, Carter asserts that the defendants were aware of the noncompliance and risk of injury. (Doc. # 1; Exh. D-1). Indeed, there was evidence of past complaint relating to handicap accessibility: In a letter from Nell Hahn, an attorney with the Advocacy Center, to Warden (and now defendant) Timothy Wilkinson, dated October 10, 2002, Hahn complained of various accessibility issues, noting in part that "[t]hresholds in a number of buildings,

including . . . the dining areas, exceed the standards for changes in level permitted by UFAS 4.5.2." (Exh. D-7).

Wilkinson testified that the prison made a number of changes following Hahn's letter, addressing such problems as access to water fountains and the height of grab bars. However, Hahn's letter did not specifically address the threshold in question. Hahn's letter notes that she did not see the thresholds in the dining hall (including the one at issue here), and she asserts that the Uniform Federal Accessibility Standards ("UFAS") apply, failing even to mention the ADA. (Doc. # 8).

In this case, the UFAS are more restrictive, basically setting the maximum threshold height at one-fourth inch (1/4") rather than the ADA's one-half inch (1/2"). As Hahn notes, because the prison was built prior to enactment of the ADA, the UFAS would have applied exclusively at the time of construction. (Doc. # 7). However, under federal regulations dealing with nondiscrimination on the basis of disability in state and local government services, 28 C.F.R. § 35.151(c) provides that design, construction, or alteration in conformance with either the UFAS or the ADA will be deemed to comply with the regulations.[1] We believe it

---

[1] 28 C.F.R. § 35.151(a) - (c) provides:

(a) Design and construction. Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.

(b) Alteration. Each facility or part of a facility altered by, on behalf of, or for the use of a public entity

5

would be a <u>non sequitur</u> to allow an altered building to conform to a more lenient standard but to hold an unaltered building to a higher standard. Thus, we believe that either standard is acceptable to these facts, including the more lenient ADA standard.

Although we ultimately find that the threshold in question was technically not compliant with the ADA, the measurement was very close. Indeed, there was evidence that the threshold had never been flagged for compliance issues, despite frequent audits, before the fall of 2006. At that time, when a state fire marshal determined that the threshold was out of compliance with the ADA, the prison administration immediately replaced it. We believe that, at worst, these facts reflect a good faith error on the defendants' part as to whether the threshold complied with applicable law.

Finally, inmate Willie Jackson testified that since 1999, when he was incarcerated at WCC, Carter was the only person he ever saw fall at either threshold in the dining hall. This was true despite the fact that other wheelchair-

---

in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

(c) Accessibility standards. Design, construction, or alteration of facilities in conformance with the Uniform Federal Accessibility Standards (UFAS) (Appendix A to 41 CFR part 101-19.6) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) (Appendix A to 28 CFR part 36) shall be deemed to comply with the requirements of this section with respect to those facilities, except that the elevator exemption contained at section 4.1.3(5) and section 4.1.6(1)(k) of ADAAG shall not apply. Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided.

bound inmates entered and exited the hall for three meals a day over several years. Clearly the condition of the threshold—even if it was not ADA compliant—did not pose a serious risk of harm.

The demonstrably minor risk posed to handicapped inmates by the threshold was not "cruel and unusual" under contemporary standards, was not serious, and did not reflect a deliberate indifference to inmate health or safety, especially in light of the eventual replacement of the threshold. At worst, there was a good faith error regarding whether the threshold in question was in compliance with applicable law. A good faith violation of ADA standards—even one that results in injury—simply does not rise to the level of "cruel and unusual punishment." Thus, Carter has no valid Eighth Amendment claim.

### III. ADA Violation

Although a violation of an ADA standard may not give rise to an Eighth Amendment claim, the violation is still relevant for some purpose. The United States Supreme Court has unequivocally held that Title II of the ADA, the title at issue here, applies to state prisons. Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998). However, remedies under Title II of the ADA for private plaintiffs are limited to injunctive relief and, in the court's discretion, attorney's fees. 42 U.S.C. § 12133; 28 C.F.R. § 35.175. We deny the award of attorney's fees in any event because the violation here was slight, was the subject of a good faith error, and was remedied when it was first shown to be out of compliance.

Furthermore, because Carter seeks damages, his claim is more appropriately redressed under state law, and we deny relief under the ADA itself.

### IV. State Law Theory

We have supplemental jurisdiction over the fundamentally related state law tort claim under 28 U.S.C. § 1367, and there is no reason to fail to exercise that jurisdiction. We believe that Carter most clearly raises a negligence claim under La. Civ. Code art. 2315. Louisiana courts analyze these claims under duty-risk analysis, which the Louisiana Supreme Court explains as follows:

> The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under LSA-C.C. art. 2315. This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability.

Lemann v. Essen Lane Daiquiris, Inc., 923 So. 2d 627, 632-33 (La. 2006) (citations omitted).

The alleged violation of an ADA standard here poses no obstacle to duty-risk analysis; indeed, the Louisiana Supreme Court has provided the following guidance:

> When the rule upon which a plaintiff relies for imposing a duty is based upon a statute, the court must attempt to interpret the legislative intent as to the risk contemplated by the legal duty, often resorting to the court's own judgment of the scope of protection intended by the Legislature. The same policy considerations which would motivate a legislative body to impose duties to protect from certain risks are applied by the court in making its determination.

<u>Carter v. City Parish Government</u>, 423 So. 2d 1080, 1084 (La. 1982) (citations omitted).

The first question is whether defendant had a duty to act or refrain from acting in a particular manner. Here, the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), 28 C.F.R. Pt. 36, App. A, provide regulatory standards for buildings and facilities, including § 4.13.8 (thresholds at doorways)[2] and § 4.5.2 (changes in levels).[3] We find that these standards are applicable to the threshold in question and that the defendants were under a general duty to comply with applicable laws concerning handicap accessibility. Second, based on the state fire marshal's finding in the fall of 2006 that the threshold was out of compliance with the ADA, we find that the defendants breached the duty to

---

[2] ADAAG § 4.13.8 provides:

> Thresholds at doorways shall not exceed 3/4 in (19 mm) in height for exterior sliding doors or 1/2 in (13 mm) for other types of doors. Raised thresholds and floor level changes at accessible doorways shall be beveled with a slope no greater than 1:2 (see 4.5.2).

[3] ADAAG § 4.5.2 provides:

> Changes in levels along an accessible route shall comply with 4.5.2. If an accessible route has changes in level greater than 1/2 in (13 mm), then a curb ramp, ramp, elevator, or platform lift (as permitted in 4.1.3 and 4.1.6) shall be provided that complies with 4.7, 4.8, 4.10, or 4.11, respectively. An accessible route does not include stairs, steps, or escalators. See definition of "egress, means of" in 3.5.

9

maintain compliance with the ADA. Third, we find that the non-compliant threshold was the cause-in-fact of Carter's fall, since his struggle to get over the threshold caused him to tumble.

Fourth, we must determine whether the defendants' breach was the legal cause of Carter's injuries. Here we look to the scope of protection afforded by the ADA and its regulations, including the ADAAG. We find that the ADA is intended both to prevent discrimination against disabled persons and to guard against physical injury to them. Materials made available by the Department of Justice, for instance, show the specific risks of injury for various violations of ADAAG standards.[4] It is common sense that guidelines suggesting a maximum threshold height—and a ramp if it should exceed that height—are intended to guard against exactly the harm suffered here. Thus, Carter's fall is well within the scope of the defendants' duty to maintain compliance with applicable law on handicap accessibility.

Having determined that all four of the above factors are present here, Carter is entitled to the recovery of actual damages. After the accident, he was diagnosed with muscle strain in his back, contusions on his hip, and a minor scrape to the lower right leg. Treatment included a slightly higher dose of Motrin than usual and a short-term prescription for a muscle relaxant. He has presented

---

[4] See, e.g., "Common ADA Errors and Omissions in New Construction and Alterations," available at http://www.ada.gov/publicat.htm (last accessed October 11, 2007).

no proof as to any costs, and it is clear from the record that he recovered quickly. Thus, we will award Carter general compensatory damages in the amount of SEVEN HUNDRED AND FIFTY DOLLARS ($750.00), which will sufficiently compensate him for his short-term and relatively minor injuries.

### V. Conclusion

For the foregoing reasons, the Court will award plaintiff Stacey Carter the amount of SEVEN HUNDRED AND FIFTY DOLLARS ($750.00) for general compensatory damages, together with interest from the date of entry of judgment pursuant to 28 U.S.C. § 1961.

SIGNED on this 11 day of October, 2007, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE